IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
WESTERN DIVISION

MARK S. MEYLOR,

       Plaintiff,

vs.

HARTFORD LIFE GROUP
INSURANCE COMPANY,

       Defendant.

No. C05-4071-DEO

MEMORANDUM OPINION AND ORDER
REGARDING DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT

---

**TABLE OF CONTENTS**

I.  INTRODUCTION AND BACKGROUND . . . . . . . . . . . . . 2
    A.  Procedural Background  . . . . . . . . . . . . 2
    B.  Factual Background . . . . . . . . . . . . . . 3

II. LEGAL ANALYSIS . . . . . . . . . . . . . . . . . . 22
    A. Standards For Summary Judgment  . . . . . . . . 22
    B.  Review Of Benefits Determinations Under ERISA  . 25
        1.  Deferential review . . . . . . . . . . . . 26
            a.  Review of plan interpretation  . . . . 27
            b.  Review of factual determinations . . . 28
            c.  The deferential review applicable here
                . . . . . . . . . . . . . . . . . . 29
        2.  "Less deferential" review . . . . . . . . . 30
            a.  When "less deferential" review is
               appropriate  . . . . . . . . . . . 30
            b.  Plaintiff's  grounds  for  "less
               deferential" review  . . . . . . . . 32
               i.  Conflict of interest  . . . . . . 32
               ii. Procedural irregularities.  . . . 35
    C.  Application Of The Substantial Evidence Test . . 37

III. CONCLUSION  . . . . . . . . . . . . . . . . . . . 42

## I. INTRODUCTION AND BACKGROUND

### A. Procedural Background

On August 22, 2005, plaintiff Mark S. Meylor filed an amended complaint against Hartford Life Group Insurance Company ("Hartford") under the civil enforcement provision of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a)(1)(B), seeking long-term disability benefits under an employee welfare benefit plan ("the Plan") sponsored by his former employer, Gateway, Inc., and insured by Hartford Life Group Insurance Company. In Meylor's amended complaint, he alleges that Hartford, without just cause, terminated his long-term disability benefits under the Plan, in violation of ERISA. In its answer, Hartford admits terminating Meylor's long-term disability benefits, but alleges the termination of these benefits was reasonable and not arbitrary or capricious.

Defendant Hartford has filed a motion for summary judgment centered on the central issue in this case, whether plaintiff Meylor is disabled under the terms of the Plan. Plaintiff Meylor filed a timely response to defendant Hartford's motion in which he argues that Hartford abused its

discretion in terminating his long-term disability benefits.

The court turns first to a discussion of the undisputed facts as shown by the record and the parties' submissions, then to consideration of the standards applicable to the motion for summary judgment, and, finally, to the legal analysis of whether defendant Hartford is entitled to summary judgment.

## B. Factual Background

The record reveals that the following facts are undisputed.[1] Plaintiff Mark S. Meylor worked as an account

---

[1] Prior to setting forth the factual background upon which the court will consider the merits of Meylor's claim, the court must determine how to handle the additional evidence not originally submitted to Hartford. This evidence is in the form of an affidavit submitted by Meylor. The Eighth Circuit Court of Appeals has held that the ability of a district court to review additional evidence not before the plan administrator when making its decision "is ruled out on deferential review" and is discouraged when conducting a de novo review. *Brown v. Seitz Foods, Inc. Disability Benefit Plan*, 140 F.3d 1198, 1200-01 (8th Cir. 1998) (quotations omitted). The Eighth Circuit indicated that the rationale of this rule is to "ensure expeditious judicial review of ERISA benefit decisions and to keep district courts from becoming substitute plan administrators." *Id.* at 1200-01; *see also Cash v. Wal-Mart Group Health Plan*, 107 F.3d 637, 641-42 (8th Cir. 1997) (holding that review under the deferential standard is limited to evidence that was before the plan administrator); *Collins v. Central States Southeast and Southwest Areas Health & Welfare Fund*, 18 F.3d 556, 560 (8th

(continued...)

executive for Gateway, Inc. ("Gateway") in its computer call center from November 21, 1988, until July 25, 2003. Meylor's primary duties were sedentary in nature and included selling Gateway products over the telephone and responding to customer calls. Meylor's position required a high school education and either a bachelor's degree or an equivalent level of experience.

Gateway's job summary for a Level III account executive is four pages in length. The job requirements, as set by Gateway, for Meylor's position, include achieving revenue and share goals set by the sales manager and adhering to minimum standards of performance as established by the sales manager.

As a Gateway employee, Meylor participated in an employee welfare plan to provide long-term disability benefits to participants who became disabled and unable to work. To fund the Plan, Gateway purchased group policy SR-83087743 from CNA

---

[1](...continued)
Cir. 1991) (concluding that "[i]n deciding whether the Trustees' denial of benefits was arbitrary or capricious, we limit our review to the evidence that was before the Trustees"). Thus, because this court does not have the authority to consider evidence that was not before Hartford when it made its decision, the court has not considered Meylor's affidavit in arriving at these undisputed facts.

Group Life Assurance Company, now known as Hartford Life Group Insurance Company.  Under the terms of the Plan, Hartford has discretion to determine eligibility benefits and to interpret the Plan.

On July 5, 2002, Meylor sustained injuries in an automobile accident.  The automobile in which Meylor was a passenger was struck broadside by another automobile.  After the accident, Meylor was treated by Dr. Thomas Clark, a neurologist.  On July 11, 2002, at his initial visit to Dr. Clark, Meylor complained of severe headaches, an inability to concentrate, a loss of balance, frustration, persistent neck pain, lightheadedness, difficulty with coordination, some bladder urgency, and difficulty with concentration.  Dr. Clark performed a neurologic examination on Meylor which was "fairly unremarkable," and concluded that there was no evidence that Meylor had suffered a "significant brain injury" in the automobile accident, although "[he] may have sustained a mild concussion given the brief loss of consciousness."  Dr. Clark also observed that "[d]espite the absen[ce] of neurologic findings, the difficulty with balance and the mild bladder urgency could suggest a mild cervical spinal cord injury."

Defendant's App. at 286.  As a result, Dr. Clark ordered an MRI of the cervical spine for Meylor.  The results of the MRI were "abnormal with moderate to severe spinal stenosis at C6-7 due to a degenerated disk with multiple HNP's at C5-6 and C6-7, moderate spinal and neuroforminal stenosis at C5-6 secondary to spondylitic changes and a small HNP at C4-5." Defendant's App. at 283.

Dr. Clark continued to treat Meylor.  Dr. Clark repeatedly told Meylor, in regard to Meylor's complaints about his inability to concentrate, that Meylor's ability to concentrate would improve with time and the resolution of his pain.  However, given Meylor's serious concerns about a brain injury, Dr. Clark recommended an MRI of Meylor's brain and neuropsychological examination.  It does not appear that Meylor underwent the MRI.  The neuropsychological examination did not reveal a severe brain injury.

Meylor continued to work in his computer sales position at Gateway for over a year.  On July 23, 2003, Meylor was suspended from his position at Gateway.  On August 7, 2003, Meylor applied for long-term disability benefits through the Plan.  In his application for long-term disability benefits,

Meylor stated he suffered from a "stiff neck and headache" since the accident, as well as having trouble with his balance and memory. Meylor further reported that he had "several incidences [sic] of forgotten meetings and calls." Defendant's App. at 58. Hartford's intake form, dated August 7, 2003, states that: "[Meylor] works in a very fast paced environment. [Meylor] has had several incidences of forgotten meetings and calls." Plaintiff's App. at 3.

The Plan states that for the first 24 months of benefits that disability is defined as:

> 1. continuously unable to perform the *Material and Substantial Duties of Your Regular Occupation*; and
>
> 2. not working for wages in any occupation for which You are or become qualified by education, training or experience.

Defendant's App. at 36 (emphasis original).

On August 11, 2003, in a form entitled "Medical Assessment Tool", Dr. Clark restricted Meylor from lifting, carrying, or bending for an indefinite period of time. Dr. Clark further noted that Meylor had "significant difficulty concentrating secondary to pain & discomfort." Defendant's App. at 297.

On October 27, 2003, Dr. Quentin Durward, a neurosurgeon, diagnosed Meylor as suffering from a "central discogenic type of pain syndrome" and recommended that Meylor undergo "an interior two level discectomy and fusion C5-6 and C6-7 with allograft and plate."  Defendant's App. at 272.  Dr. Durward also discussed Meylor's memory loss:

> One other point I want to address is his memory loss.  He feels the memory loss is a direct result of the motor vehicle accident. . .[I]t is clear that there are certain patients who after a whiplash type of injury do develop memory problems.  This is presumed to basis on a very mild brain injury with mild bilateral temporal lobe dysfunction as a consequence of the injury dynamics.  Certainly, Mr. Meyers [sic] memory loss syndrome would be consistent with this type of injury.

Defendant's App. at 272.

On November 11, 2003, in a form entitled "Medical Assessment Tool", Dr. Clark stated that Meylor was not capable of performing "full time work, which is primarily seated in nature and requires use of upper extremities for telephone and computer work."  Defendant's App. at 278.  Dr. Clark further stated that he was closing his practice and requested that any further questions be forwarded to Dr. Durward.

On November 19, 2003, based on Meylor's cervical disk

problems and his being scheduled for surgery, Hartford approved Meylor's claim for long-term disability benefits. Because Meylor's anticipated recovery time for the surgery was 2 to 3 months, long-term disability benefits were approved through February 2004. However, Hartford continued to extend benefits periodically in order to review treatment records. Hartford paid Meylor long-term disability benefits for approximately 14 months. At the time Meylor began receiving long-term disability benefits from Hartford, his salary was $1,634.38 per week, or $84,987.76 a year.[2]

On December 9, 2003, two weeks after Hartford approved Meylor's claim for long-term disability benefits, Dr. Durward submitted the same "Medical Assessment Tool" form but stated that Meylor was capable of performing "full time work, which is primarily seated in nature and requires use of upper extremities for telephone and computer work." Defendant's App. at 270.

---

[2] There is a factual dispute between the parties as to whether Meylor was entitled to a long-term disability benefit payment of $4,723.58 per month, Meylor's position, or $4,721.58 per month, Hartford's position. This factual dispute, however, does not rise to a genuine issue of material fact with respect to Hartford's motion for summary judgment.

On December 9, 2003, Meylor underwent cervical spine fusion surgery. On January 23, 2004, Dr. Durward examined Meylor following his surgery. Dr. Durward noted that Meylor was "actually doing spectacularly well" and that he had "lost his neck pain and the numbing in his hands." Defendant's App. at 263. Dr. Durward noted that although Meylor continued to experience "some pain in the inerscapular region," Meylor's surgery had effected a "perfect fusion" and that Meylor was "doing extremely well" and that he was "neurologically intact." Defendant's App. at 263.

On March 17, 2004, a medical examination of Meylor by Dr. Durward revealed that Meylor had experienced "really [ ] nice improvement in his neck discomfort and the numbness and tingling that he had in his hands. He has really had significant improvement." Defendant's App. at 262. Following an examination on May 12, 2004, Dr. Durward's assistant reported:

> Objectively, DTRs are symmetric in the upper extremities. Grip strength is strong and symmetric. The range of motion of the neck is diminished but not anymore than one would expect from someone who has had a 2 level cervical spine fusion. Doesn't complain of worsening pain or discomfort than one would expect if they move his

> neck.

> X-RAY FINDINGS: X-ray of the cervical
> spine today shows a reasonable
> incorporation of bone graft, plate, and
> screws show no evidence of breakage,
> pullout, or failure. All in all I think he
> is doing reasonably.

Defendant's App. at 261.

Although Meylor's neck pain and other spine-related medical problems showed dramatic improvement following his surgery, he complained of memory problems. By June of 2004, Meylor had told his doctors that it was memory problems which had caused him to lose his job at Gateway and become disabled. On June 17, 2004, Meylor informed Hartford that his primary complaint was his short term memory loss.

On June 7, 2004, Meylor saw his primary care physician, Dr. Kathy Opheim, who had not treated Meylor for approximately five years. Meylor admitted drinking six beers a day. Dr. Opheim told Meylor that "alcohol to this point is clouding the picture as far as memory loss." Defendant's App. at 251. Dr. Opheim referred Meylor for a neuropsychological evaluation.

On June 17, 2004, a claim note was made by a Hartford employee, which reads:

> There are no changes in functionality.

> Medical information in file prevents
> [Meylor] from performing own [occupation]
> job duties through [Neuropsychological]
> testing. May need MCM consult if no
> improvement.
>
> Benefits extended through
> [Neuropsychological] testing. Will set
> milestone to [follow-up] w/ [attending
> physician] for test results.

Defendant's App. at 76.

On June 22, 2004, a neuropsychological evaluation was performed on Meylor by Dr. Jeff Snell, a neuropsychologist. Dr. Snell noted in his report that Meylor admitted that he had been suspended from work in July 2003 for poor performance, but Meylor linked his poor performance to "memory difficulties." Defendant's App. at 252. Dr. Snell also noted that Meylor engaged in significant physical activity following his surgery, working on "finishing out the basement" and "help[ing] some friends with landscaping or dirt moving projects, with a skid loader that he owns." Defendant's App. at 253. Dr. Snell observed that in tests measuring attention and concentration, Meylor scored "within normal limits" and displayed "no deficits are noted regarding either his immediate or sustained attention abilities." Defendant's App. at 253. It was further noted by Dr. Snell that in tests

measuring visual perception, sensory motor functioning, and language ability, Meylor scored within the average to high average range. In tests measuring memory, Meylor demonstrated "overall relatively good memory skills." Defendant's App. at 255. Dr. Snell observed that Meylor had some memory difficulty, causing his scores to fall within the "low average range as compared to his peers," but also noted that Meylor demonstrated "significant improvements over measured ability in his previous evaluation." Defendant's App. at 255.

Dr. Snell concluded in his report that:

> Overall, Mark's performance on testing could be categorized as generally within the average to low average range. Only one indicator fell within the borderline range, and that being initial recall (first trial) on verbal memory tasks. Fine motor skills and some frontal executive skills appeared to generally fall within the high average range as compared to his peers. Although memory has been noted as a substantial deficit by his self report, and was noted a primary reason for his no longer being able to work, current testing appears to indicate memory skills primarily within the average to low average range overall. His memory difficulties, although they may be a suppression from his preinjury abilities, do not appear to be so severe as to preclude him from being able to engage in some type of meaningful vocational activity at this time. The degree to which that vocational activity would require

> substantially new verbal learning, however
> [sic] would certainly impact his return to
> work.

Defendant's App. at 256-57.

On August 25, 2004, Dr. Opheim wrote a letter to
Hartford, stating that:

> Mr. Meylor continues to be unable to return
> to his prior employment at Gateway. His
> limiting factor is a decreased memory
> capacity. This resulted in being removed
> from his job and the same incapacity
> continues. Though he has shown some
> improvement over time, it is not expected
> to return to normal, and it continues to
> prevent him from returning to his former
> occupation. He is unable to perform the
> job duties required at that job due to the
> brain injury.

Plaintiff's App. at 10.

On September 1, 2004, after receiving Dr. Opheim's letter
of August 25, 2004, Hartford's claim handler called Dr.
Opheim's office for clarification and spoke to Dr. Opheim's
nurse, Mary. Hartford's claim note for that conversation, and
a subsequent conversation on September 2, 2004, reads in
pertinent part:

> Mary stated that the testing results were
> in [Meylor's] chart, but she was uncertain
> if [Dr. Opheim] has reviewed it.
>      . . . .
> She states that it was [Meylor] who

> provided testing report and that [Meylor]
> was paying particular attention to the
> statement on "page 6" which indicates that
> he was capable of engaging in meaningful
> work, but with limitations. [Meylor], as
> well as [Dr. Opheim], interpreted this to
> mean that he was capable of working at some
> job, just not in his current job. Mary
> states that [Meylor] says he was terminated
> from his job because he could not [sic]
> longer answer more than 100 phone calls per
> day, keep track of orders, and manage a
> high volume of activities.

Plaintiff's App. at 14.

On September 7, 2004, a Hartford claim handler entered the following notation in Meylor's file: "There is no information in the file to support a [mental/neurological] condition that would preclude [Meylor] from [returning to work] in his own [occupation] at this time." Plaintiff's App. at 13.

On September 29, 2004, Meylor called Hartford to inquire whether they had heard from Gateway. The claim handler told Meylor that Hartford had not heard back from Gateway after leaving a voice mail message with Gateway. Meylor told the Hartford claim handler that he could get and give his Gateway manager's telephone number to Hartford if necessary.

In order to resolve inconsistencies between Dr. Snell's

report and Dr. Opheim's opinion, Hartford referred Meylor's claim and file to Dr. Chris Johnston, a psychologist, for review. In response to a question asking whether Meylor suffered from "a memory impairment that would preclude him from performing executive management skills in the workplace," Dr. Johnston made the following response:

> In the absence of a specific job description, my general response to this question is the claimant does not have a memory impairment that is in any manner debilitating. It is important to note that his level of functioning is in the low average to average range. He worked successfully as a Senior Account Executive in what appears to be a sales position having an Associate's degree in computer science following an eleventh grade education with a GED. Dr. Snell, who performed the neuropsychological evaluation, expressed the opinion during my interview of him that had the claimant attempted to return to work at the time of Dr. Snell's evaluation he likely would have experienced success then.

Defendant's App. at 234-35.

In response to a question asking him to "[r]eport information regarding restrictions/limitations," Dr. Johnston made the following response:

> Based on available information, there are no restrictions or limitations indicated in the claimant's daily functioning regarding

16

his neuropsychological status.
Defendant's App. at 235.

On December 3, 2004, Hartford's claims examiner attempted again to contact Gateway. The Hartford claims examiner spoke to Julie Keanne, a human resources representative, who indicated that she would fax Meylor's job description to Hartford. On December 6, 2004, the Hartford claims examiner again contacted Keanne to tell her that Hartford had not yet received Meylor's job description. Keanne indicated that she would email the job description to Hartford. On December 20, 2004, the Hartford claims examiner left a voice message with Dennis Lewders, Meylor's former Gateway supervisor. On December 22, 2004, the claims examiner received Meylor's Gateway job description and forwarded it to Dr. Chris Johnston. The claims examiner made a note in Meylor's claims file stating that: "[Dr. Johnston] reviewed the job description and his opinion remains unchanged on his initial report dated 10/14/04." Defendant's App. at 140.

In a letter dated December 22, 2004, Hartford notified Meylor of its decision to terminate his long-term disability benefits. Hartford indicates in the letter that it had

reviewed medical records from "Dr. Quentin Durward, Neurosurgeon, Dr. Thomas Clark, Neurologist, Dr. Kathy Opheim, PCP and Neuropsychological Evaluation by Jeff Snell." Defendant's App. at 96. These were all the physicians and neuropsychologists who actually met, talked to, examined or tested Meylor. In this letter, Hartford states that it is based its decision largely on Dr. Snell's neuropsychological evaluation and Dr. Johnston's file review.

In response, in a letter dated January 18, 2005, Meylor, through counsel, sought to appeal Hartford's decision to terminate his long-term disability benefits. In his letter, Meylor's counsel wrote:

> I represent Mark S. Meylor with respect to his long term disability claim. Please let this letter serve as Mr. Meylor's appeal of your decision of December 22, 2004, terminating his long term disability benefits.
>
> The decision terminating Mr. Meylor's long term disability benefits is arbitrary and capricous and not supported by substantial evidence. The accident that resulted in Mr. Meylor's long term disability resulted in two severe injuries. He sustained a ruptured disc at C5-C6 and C6-C7 with moderate to severe spinal stenosis. He also received a brain injury. The analysis contained in your letter of December 22, 2004 does not take into

account the impact of both of these injuries on Mr. Meylor's ability to work. The neck injury and subsequent surgery will prevent him from doing manual labor and other types of work requiring physical strength or stamina. The brain injury prevents Mr. Meylor from learning new tasks and retaining the ability to do learned tasks and prevents him from returning to his occupation with Gateway.

Enclosed is a copy of a letter of December 13, 2004, that Mr. Meylor received from his employer terminating his employment effective December 16, 2004. Dr. Snell's testing of June 2004 showed that Mr. Meylor has problems with initial recall of verbal memory tasks. Dr. Snell stated that Mr. Meylor could not return to his original job at Gateway. Mr. Meylor's brain injury prevents him from obtaining work in the computer industry. These jobs are fast paced and demand a very high level of attention to detail and good memory skills. Dr. Opheim's letter of 8/25/04 confirms that Mr. Meylor is unable to return to his prior employment. The best Dr. Snell could say on the basis of his testing was that Mr. Meylor's level of functioning "did not appear to be so severe as to preclude him from being able to engage in <u>some type</u> of meaningful employment." (Your letter of 12/22/04) Neither Dr. Snell nor your company have identified any specific jobs which you claim Mr. Meylor would have the capacity to perform.

You need to re-examine Mr. Meylor's ability to obtain any gainful employment in light of his severe neck injury and subsequent surgery and his brain injury.

> He is impacted both physically and
> cognitively from these two injuries and
> meets the test for long term disability
> benefits under your plan.

Plaintiff's App. at 18-19. Meylor did not provide any additional or new information to support his appeal.

In response to Meylor's appeal, Hartford referred his claim to Dr. Roger Blair, a physician board certified in neurology, for a medical review, and to Dr. Milton Jay, a psychologist, for a neuropsychological record review.[3] As part of his medical review, Dr. Blair spoke with Dr. Opheim. Dr. Opheim expressed reluctance to comment regarding Meylor's memory problems because she had not examined him since June 2004. Dr. Opheim did state, however, that she did not believe Meylor could return to work at the time of Dr. Snell's evaluation. She also stated that, at the time she was treating him, Meylor did not have any significant physical impairment that might prevent him from performing his computer sales job. Based upon his review, Dr. Blair concluded that Meylor was capable of returning to his computer sales job, although perhaps at a slightly less productive level than

---

[3]Dr. Jay's doctorate is in education not medicine or psychiatry.

before.[4]

Dr. Jay reviewed Meylor's complete medical records, but paid particular attention to Dr. Snell's neuropsychological testing and evaluation. Dr. Jay concluded that Meylor was not disabled. Dr. Jay stated in his report:

> Even the very worst cognitive performances by this man were not very substantially out of keeping with the normal range of skills variation around the central characterizing level in the central average range. Certainly, there was no true cognitive abnormality, and no findings were borderline abnormal. His worst performances were in the low average range, not greatly below the average range expected, since many people with a centrally average level general cognitive level have a normal range of skills down into the upper portion of below average range.

Defendant's App. at 181.[5]

In a letter dated March 18, 2005, Hartford informed Meylor and his counsel of its decision to affirm the termination of his long-term disability benefits effective

---

[4] Dr. Blair's report indicates that he viewed Meylor's occupation as being "telephone sales for Gateway Computer." Defendant's App. at 182.

[5] Dr. Jay's report indicates that he viewed Meylor's occupation as being "computer sales." Defendant's App. at 177.

December 23, 2004.

## II. LEGAL ANALYSIS

### A. Standards For Summary Judgment

Rule 56 of the Federal Rules of Civil Procedure provides that a defending party may move, at any time, for summary judgment in that party's favor "as to all or any part" of the claims against that party. FED. R. CIV. P. 56(b). "The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). As this court has explained on a number of occasions, applying the standards of Rule 56, the judge's function at the summary judgment stage of the proceedings is not to weigh the evidence and determine the truth of the matter, but to determine whether there are genuine issues for trial. *Quick v. Donaldson Co.*, 90 F.3d 1372, 1376-77 (8th Cir. 1996); *Johnson v. Enron Corp.*, 906 F.2d 1234, 1237 (8th Cir. 1990). In reviewing the record, the court must view all the facts in the light most favorable to the nonmoving party

and give that party the benefit of all reasonable inferences that can be drawn from the facts. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Quick*, 90 F.3d at 1377 (same).

Procedurally, the moving party bears "the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show lack of a genuine issue." *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)); *see also Rose-Maston v. NME Hosps., Inc.*, 133 F.3d 1104, 1107 (8th Cir. 1998); *Reed v. Woodruff County, Ark.*, 7 F.3d 808, 810 (8th Cir. 1993). When a moving party has carried its burden under Rule 56(c), the party opposing summary judgment is required under Rule 56(e) to go beyond the pleadings, and by affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e); *Celotex*, 477 U.S. at 324; *Rabushka ex. rel. United States v. Crane Co.*, 122 F.3d 559, 562 (8th Cir. 1997), *cert. denied*, 523 U.S. 1040 (1998); *McLaughlin v. Esselte Pendaflex Corp.*, 50 F.3d 507,

511 (8th Cir. 1995); *Beyerbach v. Sears*, 49 F.3d 1324, 1325
(8th Cir. 1995). An issue of material fact is "genuine" if it
has a real basis in the record. *Hartnagel*, 953 F.2d at 394
(citing *Matsushita Elec. Indus. Co.*, 475 U.S. at 586-87).
"Only disputes over facts that might affect the outcome of the
suit under the governing law will properly preclude the entry
of summary judgment," *i.e.*, are "material." *Anderson v.
Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Beyerbach*, 49
F.3d at 1326; *Hartnagel,* 953 F.2d at 394.

If a party fails to make a sufficient showing of an
essential element of a claim with respect to which that party
has the burden of proof, then the opposing party is "entitled
to judgment as a matter of law." *Celotex Corp.*, 477 U.S. at
323; *In re Temporomandibular Joint (TMJ) Implants Prod. Liab.
Litig.*, 113 F.3d 1484, 1492 (8th Cir. 1997). Ultimately, the
necessary proof that the nonmoving party must produce is not
precisely measurable, but the evidence must be "such that a
reasonable jury could return a verdict for the nonmoving
party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248
(1986); *Allison v. Flexway Trucking, Inc.*, 28 F.3d 64, 66 (8th
Cir. 1994). The court will apply these standards to

Hartford's Motion for Summary Judgment.

## B. *Review Of Benefits Determinations Under ERISA*

The Eighth Circuit Court of Appeals has summarized the standard ordinarily applicable to a court's review of a fiduciary's benefits determination under ERISA as follows:

> "ERISA provides a plan beneficiary with the right to judicial review of a benefits determination." *Woo v. Deluxe Corp.*, 144 F.3d 1157, 1160 (8th Cir. 1998); *see* 29 U.S.C. § 1132(a). It is undisputed that the Toro Plan gives the administrator discretionary authority to determine eligibility for benefits, so we would ordinarily review the administrator's decision for abuse of discretion. *See Woo*, 144 F.3d at 1160. "This deferential standard reflects our general hesitancy to interfere with the administration of a benefits plan." *Layes v. Mead Corp.*, 132 F.3d 1246, 1250 (8th Cir. 1998). Under such standard, a reviewing court should consider only the evidence before the plan administrator when the claim was denied. *Id.* at 1251.

*Heaser v. Toro Co.*, 247 F.3d 826, 833 (8th Cir. 2001).

The parties here agree that, as in *Heaser*, the Plan gives Hartford discretionary authority to determine eligibility for benefits, so that the court would ordinarily review Hartford's decision to terminate Meylor's long-term disability benefits in this case for abuse of discretion. *Id.* The court

therefore begins its legal analysis with consideration of the deferential "abuse of discretion" standard of review "ordinarily" applicable to a plan administrator's discretionary denial of benefits. *See Heaser*, 247 F.3d at 833.

### 1. *Deferential review*

Under the deferential "abuse of discretion" standard of review, "an administrator's decision to deny benefits will stand if reasonable." *Farley v. Arkansas Blue Cross & Blue Shield*, 147 F.3d 774, 777 (8th Cir. 1998).[6] However, as the Eighth Circuit Court of Appeals has also explained, the nature of the review for "reasonableness" depends upon the basis on which the plan administrator denied the claim for benefits. *See Donaho v. FMC Corp.*, 74 F.3d 894, 898-900 (8th Cir. 1996); *see also Farley*, 147 F.3d at 777 & n.6 (citing *Donaho*).

---

[6] The Eighth Circuit Court of Appeals has explained that "abuse of discretion," "arbitrary and capricious," and "reasonableness" are synonymous in the context of review of denial of claims under ERISA. *See Donaho v. FMC Corp.*, 74 F.3d 894, 898-900 (8th Cir. 1996).

### a.  Review of plan interpretation

"When determining whether an administrator's interpretation of a plan is reasonable, [courts in this circuit] apply a five-factor test." *Farley*, 147 F.3d at 777 n.6 (citing *Finley v. Special Agents Mut. Benefit Ass'n, Inc.*, 957 F.2d 617, 621 (8th Cir. 1992)); *Donaho*, 74 F.3d at 899 n.9 (same, also citing *Finley*).  That five-factor test, as explained in *Finley v. Special Agents Mutual Benefit Association, Inc.*, 957 F.2d 617 (8th Cir. 1992), consists of the following:

> In determining whether the [plan administrator's] interpretation of [disputed terms] and decision to deny the [claimed] benefits are reasonable, [courts] consider [1] whether [the plan administrator's] interpretation is consistent with the goals of the Plan, [2] whether [the plan administrator's] interpretation renders any language in the Plan meaningless or internally inconsistent, [3] whether [the plan administrator's] interpretation conflicts with the substantive or procedural requirements of the ERISA statute, [4] whether [the plan administrator] ha[s] interpreted the words at issue consistently, and [5] whether [the plan administrator's] interpretation is contrary to the clear language of the Plan. *See De Nobel v. Vitro Corp.*, 885 F.2d 1180, 1188 (4th Cir. 1989) (citing cases).

*Finley*, 957 F.2d at 621.

### b. *Review of factual determinations*

However, when the court is "asked to review the administrator's evaluation of the facts to determine the application of the Plan . . . the five-factor test is not instructive." *Farley*, 147 F.3d at 777 n.6 (citing *Donaho*, 74 F.3d at 899-900 n.9). Instead, in such circumstances, "[i]n determining reasonableness, [courts of this circuit] focus on whether the decision is supported by substantial evidence." *Id.* at 777 (citing *Donaho*, 74 F.3d at 900); *Donaho*, 74 F.3d at 900 (concluding that "'substantial evidence' is only a quantified reformulation of reasonableness" in cases involving the plan administrator's evaluation of the facts to determine plan application). "Substantial evidence" is "'more than a scintilla but less than a preponderance.'" *Woo*, 144 F.3d at 1162 (quoting *Donaho*, 74 F.3d at 900 n.10).

As to the process to determine whether the administrator's determination is supported by "substantial evidence," "[courts] consider only the evidence that was before the administrator when the claim was denied." *Farley*, 147 F.3d at 777 (citing *Brown v. Seitz Foods, Inc., Disability*

*Benefit Plan*, 140 F.3d 1198, 1200 (8th Cir. 1998)). However, courts do not "substitute [their] own weighing of the evidence for that of the administrator." *Id.* (citing *Cash v. Wal-Mart Group Health Plan*, 107 F.3d 637, 641 (8th Cir. 1997)). Despite this deference to the plan administrator's weighing of the evidence, "[t]he unreasonableness of a plan administrator's decision can be determined by both the quantity and quality of the evidence supporting it." *Donaho*, 74 F.3d at 900.

### c. The deferential review applicable here

Because the "reasonableness" of Hartford's decision to terminate Meylor's long-term disability benefits in this case is contested only on the basis of the "reasonableness" of Hartford's evaluation of the facts to determine whether Meylor continued to meet the Plan's definition of disabled, i.e. whether he was disabled from returning to his position at Gateway, the court must conduct a "substantial evidence" analysis of Hartford's factual finding that Meylor was not disabled. However, before performing this "ordinary" deferential review, *see Heaser*, 247 F.3d at 833, the court must also take up Meylor's contention that "less deferential"

review is appropriate in this case.

### 2. "Less deferential" review

#### a. When "less deferential" review is appropriate

Although courts must "ordinarily review the administrator's decision for abuse of discretion," *see Heaser*, 247 F.3d at 833, as the Eighth Circuit Court of Appeals also explained in *Heaser*, an administrator's denial of benefits is not *always* entitled to that sort of "deferential" review:

> A plaintiff may obtain less deferential review by presenting "material, probative evidence demonstrating that (1) a palpable conflict of interest or a serious procedural irregularity existed, which (2) caused a serious breach of the plan administrator's fiduciary duty to her." *Woo*, 144 F.3d at 1160. An alleged conflict or procedural irregularity must have some connection to the substantive decision reached. *Id.* at 1161. A claimant must offer evidence that "gives rise to serious doubts as to whether the result reached was the product of an arbitrary decision or the plan administrator's whim" for us to apply the less deferential standard. *Layes*, 132 F.3d at 1250 (internal quotation marks omitted).

*Heaser*, 247 F.3d at 833; *accord Parkman v. Prudential Ins. Co.*, 439 F.3d 767, 772 n.5 (8th Cir. 2006). Thus, when faced with a contention that less deferential review is appropriate, the court must decide whether the claimant has "offer[ed]

evidence that 'gives rise to serious doubts as to whether the result reached was the product of an arbitrary decision or the plan administrator's whim.'" *Heaser*, 247 F.3d at 833 (quoting *Layes*, 132 F.3d at 1250). There are two steps in that process: The court must first decide whether the claimant has presented "'material, probative evidence demonstrating that . . . a palpable conflict of interest or a serious procedural irregularity existed," then determine whether that conflict or irregularity "'caused a serious breach of the plan administrator's fiduciary duty to her.'" *Id.* (quoting *Woo*, 144 F.3d at 1160); *accord Parkman*, 439 F.3d at 772 n.5.

If the claimant has persuaded the court that there is a conflict of interest or procedural irregularity that caused a breach of the administrator's fiduciary duty, such that "less deferential" review is appropriate, the court must decide what "proportion" of deference should be given the plan administrator's determination in light of the conflict of interest or procedural irregularities. *See Woo*, 144 F.3d at 1161-62. For example, in *Woo*, after finding a conflict and irregularities that "had a sufficient connection to the decision reached to trigger a less deferential review," the

court decided that the conflict and irregularities were so "egregious" that the court would "require that the record contain substantial evidence bordering on a preponderance to uphold [the administrator's] decision" to deny benefits on factual grounds. *Id.* at 1162.

### b. Plaintiff's grounds for "less deferential" review

*i. Conflict of interest.* Meylor argues that "less deferential" review is appropriate here, because Hartford had a conflict of interest as both insurer and plan administrator for the Plan. He argues that, as a profit-making company, Hartford had a financial interest in terminating his long-term disability benefits.

The Eighth Circuit Court of Appeals has recognized that when the insurer is also the plan administrator, "something akin to a rebuttable presumption of a palpable conflict of interest" exists. *Schatz v. Mutual of Omaha Ins. Co.*, 220 F.3d 944, 947-48 (8th Cir. 2000); *see Farfalla v. Mutial of Omaha Ins. Co.*, 324 F.3d 971, 973 (8th Cir. 2003); *Phillips-Foster v. UNUM Life Ins. Co.*, 302 F.3d 785, 795 (8th Cir. 2002). "Indicia of bias can be negated by 'ameliorating

circumstances' such as 'equally compelling long-term business concerns' that militate against improperly denying benefits despite the dual role." *Schatz*, 220 F.3d at 948 ( citing *Barnhart v. UNUM Life Ins. Co.*, 179 F.3d 583, 588 (8th Cir. 1999). The Eighth Circuit Court of Appeals has further noted that "[n]ot every funding conflict of interest, however, warrants heightened review because ERISA itself contemplates the use of fiduciaries who might not be entirely neutral." *Tillery v. Hoffman Enclosures, Inc.*, 280 F.3d 1192, 1197 (8th Cir. 2002) (citation omitted). *see Davolt v. The Executive Comm. of O'Reilly Auto.*, 206 F.3d 806, 809-10 (8th Cir. 2000) (holding the district court erred by finding an automatic conflict of interest merely because insurer and administrator were the same). The Eighth Circuit Court of Appeals has further indicated that "it is wrong to assume a financial conflict of interest from the fact that a plan administrator is also the insurer." *McGarrah v. Hartford Life Ins. Co.*, 234 F.3d 1026, 1030 (8th Cir. 2000); *see Davolt v. The Executive Comm. of O'Reilly Auto.*, 206 F.3d 806, 809-10 (8th Cir. 2000) (holding the district court erred by finding an automatic conflict of interest merely because insurer and administrator

were the same).

It is unclear under Eighth Circuit law whether the plaintiff has the burden of producing actual evidence of a financial conflict, or whether the defendant, after the plaintiff has alleged that the defendant is both the insurer and the administrator, has the burden of producing evidence to rebut the presumption of a conflict of interest. *Compare McGarrah*, 234 F.3d at 1030, with *Schatz*, 220 F.3d at 947-48, *Phillips-Foster*, 302 F.3d at 795, and *Torres v. UNUM Life Ins. Co.*, 405 F.3d 670, 678 (8th Cir. 2005). Here, plaintiff Meylor has made the bare allegation of a financial conflict based on Hartford's dual role as both insurer and administrator, but has produced no evidence that this dual role influenced Hartford's decision to terminate Meylor's long-term disability benefits. Thus, on the summary judgment record before it, the court cannot conclude that defendant Hartford's dual role influenced its decision in this case or created a palpable conflict of interest. Hartford's consideration of extensive medical evidence in making its decision to terminate Meylor's long-term disability benefits as well as Hartford's decision to obtain reviews by Dr.

Johnston, Dr. Blair and Dr. Jay before making its decision dissipate the allegations of a conflict of interest.

*ii. Procedural irregularities.* In determining whether "procedural irregularities" occurred, the court is to consider whether the plan administrator's decision "'was made without reflection or judgment, such that it was the product of an arbitrary decision or the plan administrator's whim.'" *Parkman*, 439 F.3d at 772 n.5 (quoting *Pralutsky*, 435 F.3d 833, 838 (8th Cir. 2006) (quotation and citation omitted)). Here, plaintiff Meylor contends that Hartford engaged in procedural irregularities in the termination of his long-term disability benefits. Specifically, Meylor argues that despite Dr. Opheim's opinion regarding Meylor's condition, i.e. his memory problems, Hartford's claims file for Meylor still stated that "there is no information in the file to support an M/N condition that would preclude EE from RTW in his own OCC at this time."[7] Plaintiff's App. at 13. Meylor also points to the fact that Hartford never interviewed Meylor's

_____

[7]In plain English, this means there is no information in the file to support a mental condition that would preclude the plaintiff from returning to work in his own occupation at this time.

35

supervisor at Gateway or other Gateway executives in order to determine the expected levels of performance for an employee in Meylor's prior position at Gateway. On the summary judgment record before the court, the court cannot conclude Hartford committed irregularities so severe that the court has "'a total lack of faith in the integrity of the decision making process.'" *Parkman*, 439 F.3d at 772 n.5 (quoting *Pralutsky*, 435 F.3d at 838). Although Hartford never interviewed Meylor's supervisor or other executives at Gateway, the court notes Hartford did attempt to contact Dennis Lewders, Meylor's former Gateway supervisor on December 20, 2004. Moreover, Hartford did obtain Meylor's Gateway job description and forwarded it to Dr. Chris Johnston before making a final decision. Finally, even though Hartford's claims file for Meylor incorrectly stated on September 7, 2004 that "there is no information in the file to support an M/N condition that would preclude EE from RTW in his own OCC at this time," Hartford's subsequent actions demonstrate that it understood the character of Dr. Opheim's opinion. Specifically, Hartford referred Meylor's claim and file to Dr. Chris Johnston, a psychologist, for review in order to resolve

inconsistencies between Dr. Snell's report and Dr. Opheim's opinion. Thus, the court concludes that plaintiff Meylor is not entitled to have his claim reviewed under the less deferential standard of review.

### C. *Application Of The Substantial Evidence Test*

Because deferential "abuse of discretion" review is applicable here, the question the court must address on summary judgment is whether Hartford abused its discretion. Here, Hartford's determination to terminate Meylor's long-term disability benefits under the Plan turns on a factual determination , namely whether Meylor was "continuously unable to perform the *Material and Substantial Duties of [his] Regular Occupation*," the Plan's definition of disability for the first 24 months of benefits, at the time Hartford decided to terminate Meylor's long-term disability benefits.

On the summary judgment record before it, the court concludes that plaintiff Meylor did submit sufficient evidence to establish that he was disabled under the terms of the Plan. Meylor's treating physician, Dr. Opheim provided an opinion to Hartford that:

> Mr. Meylor continues to be unable to return

> to his prior employment at Gateway. His
> limiting factor is a decreased memory
> capacity. This resulted in being removed
> from his job and the same incapacity
> continues. Though he has shown some
> improvement over time, it is not expected
> to return to normal, and it continues to
> prevent him from returning to his former
> occupation. He is unable to perform the
> job duties required at that job due to the
> brain injury.

Plaintiff's App. at 10. Moreover, Dr. Durward, a neurosurgeon, found that Meylor's memory loss was consistent with "a very mild brain injury." Defendant's App. at 272.

Hartford asserts that it is entitled to rely on the opinions of Dr. Snell and the reviewing physician and psychologists, Dr. Blair, Dr. Johnston and Dr. Jay, who gave contrary opinions because the "treating physician rule", under which the opinions of treating physicians must be accorded special weight, does not apply to disability benefit determinations under plans governed by ERISA. *See Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825 (2003); see also *Hunt v. Metropolitan Life Ins. Co.*, 425 F.3d 489, 491 (8th Cir. 2005). In addition, Hartford is correct in its assertion that because the record reflects conflicting medical opinions, "'the plan administrator does not abuse his

discretion in finding that the employee is not disabled.'"
*Smith v. Unum Life Ins.*, 305 F.3d 789, 796 (8th Cir. 2002)
(quoting *Donaho*, 74 F.3d at 901).

The flaw in Hartford's analysis lies in the fact that Dr.
Opheim is the only examining physician in the record who
squarely addressed the issue of whether Meylor could return to
his prior position as an executive in sales at Gateway.  That
is the determinative factual question at issue here under the
Plan.  Dr. Snell did not state that Meylor could return to his
prior executive position at Gateway.  Instead, Dr. Snell
opined only that: "[Meylor's] memory difficulties, although
they may be a suppression from his preinjury abilities, do not
appear to be so severe as to preclude him from being able to
engage in some type of meaningful vocational activity at this
time."  Defendant's App. at 257.  Dr. Johnston, a reviewing
psychologist, rendered his initial conclusion, that Meylor did
not have a memory impairment that was "in any manner
debilitating", Defendant's App. at 234, without the benefit of
Meylor's job description at Gateway.  Although it is
uncontested that Dr. Johnston was subsequently provided with
Meylor's job description at Gateway, some two months after he

submitted his report, and later orally told a claims handler at Hartford that his opinion remained unchanged, Dr. Johnston's oral proclamation is nothing more than an *ipse dixit*[8]. Moreover, the court notes that the opinion of a reviewing physician is generally accorded less deference than that of an examining physician. *Smith*, 305 F.3d at 795; *Donaho*, 74 F.3d at 901. The opinions given by Drs. Blair and Jay also contain crucial defects. Specifically, Dr. Blair's report only indicates that Meylor's prior position at Gateway was in "telephone sales for Gateway Computer." Defendant's App. at 182. Thus, it is unclear on the record before the court whether Dr. Blair had reviewed and considered Meylor's actual job description at Gateway, as opposed to an entry level telephone sales associate, when he concluded that Meylor was capable of returning to "his previous occupation that involved telephone sales", although perhaps at a slightly less productive level than before. Dependant's App. at 194. The court further notes that Dr. Blair's conclusion begs the question, since it is unclear whether Meylor would be able to perform the material and substantial duties of his executive

---

[8] An unsupported assertion.

position at Gateway if he was less productive than before the accident.

Dr. Jay's report suffers from a similar malady, referring to Meylor's prior executive position at Gateway as "computer sales." Defendant's App. at 177. It is again unclear from the summary judgment record whether Dr. Jay had reviewed Meylor's actual job description at Gateway when he concluded that Meylor was capable of "occupational functioning." Defendant's App. at 181. Thus, the court cannot conclude, on the record before it, that Hartford did not abuse its discretion in determining that Meylor was not disabled at the time it terminated his long-term disability benefits. Therefore, because the court cannot conclude as a matter of law, on the summary judgment record before it, that Hartford's decision to terminate Meylor's long-term disability benefits was supported by substantial evidence, defendant Hartford's Motion For Summary Judgment is denied.

### III. CONCLUSION

The court concludes that it cannot find as a matter of law, on the summary judgment record here, that Hartford's decision to terminate Meylor's long-term disability benefits

was supported by substantial evidence. Therefore, defendant Hartford's Motion For Summary Judgment is **denied**.

　　**IT IS SO ORDERED** this 31st day of July, 2006.

_____
Donald E. O'Brien, Senior Judge
United States District Court
Northern District of Iowa