# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
## WESTERN DIVISION

MARK S. MEYLOR,

    Plaintiff,

vs.

HARTFORD LIFE GROUP
INSURANCE COMPANY,

    Defendant.

**No. C05-4071-DEO**

**ORDER**

_____

One of the tough problems involved in this case is that Mark Meylor claims that he lost his memory because of his accident and that this memory loss prevented him from being able to competently perform the complex duties of his "sales" job by reason of his inadequate job performance. Meylor was suspended. He made a claim under ERISA (Employee Retirement Income Security Act of 1974). Hartford initially approved his claim and paid Mark Meylor $4,721.58 per month for fourteen (14) months, totaling $66,102.12. The parties agree that the Hartford Insurance policy provides for the payment of $4,721.58 for every month that the plaintiff could not perform the job he had before his accident, for a maximum of twenty-four (24) months. This lawsuit involves plaintiff's claim for payment for ten (10) more months at $4,721.58 per month for a total of $47,215.80.

The Court is persuaded that a chronology of events would be helpful to show just how this situation developed.

**CHRONOLOGY**

1. Meylor worked for Gateway, Inc. from November 21, 1988 to July 25, 2003.

2. On July 5, 2002, Meylor was involved in a car accident.

3. July 11, 2002 saw Meylor saw Dr. Clark. Dr. Clark noted "no evidence of a significant brain injury"; possible mild concussion; possible cervical spinal cord injury.

4. Meylor continued working at Gateway for over a year after the accident, but was suspended on August 7, 2003 because Gateway decided that he was not performing his job up to their expectations.

5. August 11, 2003, Dr. Clark filled out a form that indicated that Meylor had "significant difficulty concentrating secondary to pain & discomfort."

6. October 27, 2003, Dr. Quentin Durward, a neurosurgeon, noted Meylor suffers from "central discogenic[1]

---

[1] "Caused by derangement of an intervertebral disk." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 527 (30th ed. 2003).

type of pain syndrome"; Dr. Durward commented about Meylor's memory loss as being consistent with a mild brain injury.

7. November 11, 2003, Dr. Clark noted on a form that Meylor was not capable of performing "full time work".

8. November 19, 2003, Hartford approved Meylor's claim (initially through February of 2004, but ultimately paid for 14 months).

9. December 9, 2003, Dr. Durward submitted the same type form that Dr. Clark had completed but Dr. Durward concluded that Meylor was capable of performing "full time work".

10. December 9, 2003, Meylor underwent cervical spine fusion surgery.

11. June 7, 2004, Meylor saw Dr. Kathy Opheim, who had not seen Meylor for approximately five years, Dr. Opheim informed Meylor that alcohol is "clouding" his memory capabilities and ordered a neuropsychological evaluation.

12. June 17, 2004, Meylor informed Hartford that his short term memory loss was his primary complaint.

13. June 22, 2004, a neuropsychological evaluation was performed on Meylor by Dr. Jeff Snell, a neuropsychologist. Dr. Snell noted that Meylor had "overall relatively good

memory skills" but had some memory difficulty causing his scores to fall within the "low average range".

14. August 25, 2004, Dr. Opheim wrote a letter indicating that Meylor would not be able to return to his prior employment at Gateway due to decreased memory capacity.

15. October of 2004, Hartford referred Meylor's claim to Dr. Chris Johnston, a psychologist, for review because of the inconsistencies between Dr. Opheim and Dr. Snell. Dr. Johnston concluded, without knowing Meylor's actual job description, that Meylor does not have a memory impairment that is in any manner debilitating. Subsequent to Dr. Johnston's initial opinion, Hartford obtained Meylor's actual job description and forwarded it on to Dr. Johnston; after reading it, Dr. Johnston indicated that his opinion remained unchanged with respect to Meylor's not having a memory impairment.

16. December 22, 2004, Hartford sent a letter to Meylor indicating that they were terminating his long-term disability benefits. Meylor appealed this decision; therefore, Hartford acquired the services of Dr. Roger Blair, a physician, board-certified in neurology; and Dr. Milton Jay, a psychologist.

17. Dr. Blair concluded that Meylor could likely return to his computer sales job at Gateway at a slightly slower level and "at least in the average range for his previous work activities", , but noted some slight difficulties in memory.

18. Dr. Jay, based largely on Dr. Snell's report, concluded that Meylor was "not disabled" and his worst performances were in the "low average range."

19. March 18, 2005, Hartford informed Meylor by letter that they were affirming their decision to terminate long-term disability benefits effective December 23, 2004.

On March 18, 2005, Hartford wrote plaintiff's counsel a letter (Defendant's App. 173)[2]. The Hartford letter on the first page outlines some of the attributes the plaintiff would have to possess in order to hold down a Senior Account Executive Level 3 position at Gateway. It includes the following:

> The ability to handle administrative work, preparation of quotes and paperwork or perspective customers, orders, processing paperwork, filing, bids, proposals and order entry. Interact with customers, creative thinking, problem solving, ability to deal with supervisors and top level managers, make effective decisions quickly, capability to work on his own with little

---

[2]Defendant's Appendix is at Docket No. 16-3 of the Clerk's Memorandum of papers in this matter.

5

> or no supervision, the ability to communicate clearly, and the ability to manage accounts.

These are things that Mark Meylor was expected to do every day before his accident. He was expected to make 100 calls a day. He was the top salesman; he sold $15 million in sales in one year, and the position he held was a very hard-charging, complex, all-day long job. These job expectations are set out on pages 21 through 25 of plaintiff's appendix. His duties are many, complex and tough.

On page two of the defendant's above-mentioned letter to the plaintiff's counsel (Defendant's App. p. 174) in the third paragraph, it states:

> In the independent medical review performed by Chris Johnston indicates Mr. Meylor does not have a memory impairment that is debilitating. His functional level is in the low average to average range.

This, of course, refers to a test given the plaintiff by a doctor hired by the defendant after his accident to try to show that he was able to adequately perform his pre-accident job.

In the sixth paragraph on appendix page 174, the letter to plaintiff's counsel states:

> Meylor had a normal I.Q. Above-average executive functioning and may have had some

6

> mild decrease in memory abilities prior to
> his motor vehicle accident.[3]

The above paragraph was being discussed by Dr. Blair[4], a doctor hired by the defendant. Dr. Blair was quoting Dr. Opheim, plaintiff's doctor.

Dr. Jay was a doctor hired by the defendant. Dr. Jay was given a report about the plaintiff authored by Dr. Snell, a doctor hired by the plaintiff. On appendix 178 toward the bottom of the page, Dr. Jay quotes Dr. Snell. (Def. App. 178). Dr. Snell had tested Mark Meylor in September of 2002, some two (2) months after the plaintiff's accident. Dr. Snell also tested the plaintiff on or about June 22, 2004. In 2004, Dr. Snell said plaintiff had a better I.Q. and performance I.Q. in 2004. Snell said plaintiff was in the "low-average" range in 2004. It is argued that the plaintiff was still able to adequately perform his job as he had been before the accident. This, of course, is very hard to buy based upon the

---

[3] This sentence is poorly worded. Counsel for the defendant agreed with the Court that it does not intend to comment in any way as to any decrease of memory abilities plaintiff had before his accident.

[4] Dr. Blair is identified in paragraphs 16 & 17 of the above chronology.

star salesman that he was and the job he was doing before the accident.

On the last page of the neuropsychologist's letter, in summarizing Dr. Snell report's, Dr. Jay says:

> Even the worst cognitive performances by this man were not very substantially out of keeping with the normal range of skills variation about the central characterizing level of the central average range. Certainly there was no true cognitive abnormality and no findings were borderline abnormal. His worst performances were in the low-average range, not greatly below the average range expected. Since many people with the centrally average level general cognitive level have an abnormal range of skills down to the upper portion of the below average range.

Defendant's App. p. 181.

This is a lot of jargon but Dr. Jay is paraphrasing what he understands Dr. Snell is saying, plaintiff's worst performances were low-average and that is plural, so they are talking about more than one of the categories involved.

Dr. Blair, a neurologist hired by the defendant has a twelve (12) page report talking about tests that plaintiff took. Defendant's App. p. 182-194. His report state: "In trail making part-B test, he fell within the low-normal range." He sets out:

8

> On memory, Mark's performance on various aspects of memory appeared to demonstrate overall relatively good memory skills at this time. On the California verbal learning test, his initial recall for the first trial was noted as within the borderline range. (That is below, low average. And the quote goes like this..) His initial recall for the first trial was noted as within the borderline range, but he quickly warmed up to the task and subsequent trial generally fell within the low-average to average range. . . However, over time, it appeared to deteriorate somewhat and his long delayed recall and recognition appeared to fall more within the low-average range executive functioning. He performed on a low average rather than average range. Emotional factors: he had a valid profile, an a validity consideration suggests a high degree of repression and denial with a generalized lack of flexibility and poor insight.

Defendant's App. p. 190.

Dr. Blair representing the defendant then talks about Dr. Clark, plaintiff's doctor who first saw plaintiff and who felt that plaintiff's complaints of memory difficulties had to due with pain and were not due to any significant neuropsychological impairments[5]. "As time went along, it appears that he had little more difficulties with memory than

---

[5] Problems associated with the functioning of the brain and cognitive processes or behavior. DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1259 (30th ed. 2003).

he had initially post-motor vehicle accident." (Defendant's App. p. 193).

Dr. Blair continues:

> With regard to his memory and executive functions, the neuropsychological testing did show that the claimant has a normal I.Q., an above-average executive functioning, and may have had some mild degrees in memory abilities prior to his motor vehicle accident.

He further states:

> However, Dr. Snell, neuropsychologist felt that his impairment did not appear to be so severe as to preclude him from being able to engage in some type of meaningful vocational activity at this time. The degree to which this vocational activity would require substantially new verbal learning, however, would certainly impact his return to work . . .

Defendant's App. p. 193-94.

Dr. Snell, plaintiff's doctor then, noted that,

> [A]lthough his personality profile suggests potential resistance for addressing the psychological factors which may be exacerbating the subjective experience of the pain sensation associated with the physical symptoms, it would appear that Mark would benefit from at least short-term counseling including issues of pain management. Therefore, it appears that the claimant could even improve on his intellectual and "memory" difficulties with short-term counseling. At this point, the neuropsychological testing is consistent with the normal IQ and perhaps slight

10

> difficulties in some memory tasks, which might make him a little slower, overall than he was in carrying out intellectual activities prior to his motor vehicle accident.

Defendant's App. p. 194.

The Dr. Blair's, defendant's doctor, report then goes down a few more lines and says:

> Therefore, at this time, based on the neuropsychological data available, it appears that he could return to his previous occupation that involved doing telephone sales though he likely would be performing at a somewhat lower pace and may not make as many sales which may in turn cut down on his potential income.

Defendant's App. p. 194.

This is an admission by Dr. Blair that in his opinion, plaintiff certainly was not as proficient after the accident as before. His opinion was on track since the people at Gateway who worked with the plaintiff fired him after ten (10) months because he could no longer perform his job.

Chris Johnston is a licensed psychologist who in his report (Defendant's App. p. 234) asks himself some questions and then gives his answers to set out what he has concluded. In question number 1, as to plaintiff's conduct, he asks, "Are the neuropsychological evaluation results valid and reasonable?" He answers, "Yes, the claiman[t] [plaintiff] was

11

cooperative with the assessment, there were no indicators of symptom magnification, and the data reflected internal consistency, that is, not of questionable validity or reliability." Defendant's App. p. 234. This is an important conclusion by a doctor hired by the defendant, where he flatly says, the plaintiff is not exaggerating anything.

On the second page of Johnston's letter, Defendant's App. p. 235, he quotes Dr. Snell as saying, that if the plaintiff had attempted to return to work "at the time of my evaluation" he likely would have experienced success then (in performing his pre-accident job). Whether this quote of Dr. Snell is deadly accurate will be discussed later in this ruling. Dr. Snell evaluated the plaintiff twice. The first time in September 2003. The plaintiff was working then. Dr. Snell saw plaintiff again on June 22, 2004, so he must be speaking of that day. This was a whole year after Gateway had fired him (July 23, 2003). There is no way he could even show up for work eleven (11) months after he was fired.

The second question Chris Johnston asks himself (Defendant's App. p. 234), "Does the information support that the claimant has memory impairment that would preclude him from performing executive management skills in the workplace?"

12

Johnston answers:

> [T]he claimant does not have a memory impairment that is in any manner debilitating.

He goes on to say, however:

> It is important to note that his level of functioning is in the low average to average range. He worked successfully as a Senior Account Executive in what appears to be a sales position having an Associate's Degree in computer science following an eleventh grade education with a GED.

Defendant's App. p. 235.

It appears Johnston is saying that plaintiff is in low-average in functioning; but he is not in low-average for smart people, he is in low-average for eleventh grade education with GED or as defendant's counsel informed the Court during arguments, "low-average to general population." This, of course, is the same person who sold $15 million dollars worth of computers in one year; was the leading salesman; made 100 calls per day and had to know "everything". (See Defendant's App. p. 173). This does not seem reasonable to this Court.

As mentioned, the defendant's doctors quote Dr. Snell and say that his evaluation was that the plaintiff would likely have experienced success if he had gone back to work in June of 2004 (Defendant's App. p. 235). Dr. Snell did not say "the

success plaintiff had before his accident." He only says, Meylor is "likely" to have success. Dr. Snell's second evaluation, Defendant's Appendix pp. 252-57, set out in paragraph 13, page 3 of this Order, is not a strong, flat opinion. It is made referring to a time frame in June of 2004, eleven (11) months after the plaintiff had been fired because the people who observed Meylor work at his old job had concluded he could not do it anymore. The people who suspended him were the least likely to fire him because his previous sales had been so high that he undoubtedly had made them nice profits. Dr. Snell's conclusions that Meylor was "likely" to have success is not solid evidence which precludes this Court from finding that his opinion is not controlling here.

There is a letter from Dr. Johnston about his conversation with Dr. Snell and Dr. Johnston says, is this what we talked about? And Snell says, "yes, this is what we talked about." On page 236 (Defendant's Appendix), they quote Dr. Snell as saying:

> At the time of his assessment, Mr. Meylor's subjective complaint of difficulty was worse than his test scores indicated. In fact, you did not find him to be impaired, per se, when compared to the population in general. However, Mr. Meylor may have

14

>   experienced some decrease in functioning if
>   the comparison for his present test scores
>   would be his own premorbid[6] level of
>   ability.

This quote is an admission by Dr. Snell recognizing that the plaintiff very possibly was not operating on the same, high level that he had been prior to his accident. In his opinion, Dr. Snell writes:

>   From a functional standpoint, however, his
>   attention concentration appears to be
>   adequate for normal day to day functioning.

Defendant's App. p. 255.

Normal day-to-day functioning may be eating and driving, etc. "On a task involving divided attention, a slight suppression of ability was noted, with his performance on Trail Making Test, Part-B falling within the low average range." So, he is still low as to range, but the defendant's doctor, Dr. Blair, says that in his opinion, plaintiff has some memory difficulties but plaintiff likely "could return to his previous occupation that involved doing telephone sales though he likely would be performing at a somewhat lower pace and may not make as many sales which may in turn cut down hon his potential income." (Defendant's App. p. 131). Dr. Blair went

---

[6] Premorbid is a reference to plaintiff's abilities before the accident of July 5, 2002.

15

on to conclude that this would have been effective as of December 23, 2004. He does not give this opinion until the date of his report, March 15, 2005. This is eighteen (18) months after the Gateway people suspended Meylor because he could not do the work anymore. All the defense doctors, Blair, Jay and Johnston, as a basis for their opinion, quote Dr. Snell as having said he can go back to his old job.[7] Dr. Johnston's conclusions (Defendant's App. p. 235), quoting what Dr. Snell said, was not deadly accurate.

What Dr. Snell really said was:

> Although memory has been noted as a substantial deficit by his self report, and was noted a primary reason for his no longer being able to work, current testing appears to indicate memory skills primarily within the average to low average range overall. His memory difficulties, although they may be a suppression from his preinjury abilities, do not appear to be so severe as to preclude him from being able to engage in some <u>type of meaningful vocational activity at this time</u>. The degree to which that vocational activity would require substantially new verbal learning, however, would certainly impact his return to work.

Defendant's App. p. 256, 257.

The words, "preclude him from . . . some type of

---

[7] This Court is well aware that in ERISA cases, treating physician's opinions are not entitled to more weight than non-treating physicians.

meaningful vocational activity" is not a flat saying, "he can return to his old job." This is even more clear because the next sentence says, that any "<u>new</u> verbal learning, however, would certainly impact his return to work." Dr. Snell knew that if he was back at his old job, there would be no "new verbal learning." This persuades this Court that the defendant's decision that the plaintiff could go back to his old job is not "reasonable". Even if it somehow was reasonable, he did not have such a job to return to, and his old employer or some company in the same business would have to make such a decision.

Based on what Dr. Snell has concluded as set out above, it is not reasonable to conclude it ever would happen.

Dr. Durward sent a letter to Dr. Opheim (Defendant's App. p. 272) explaining the fusion he performed on the plaintiff, and then at the bottom of the page Dr. Durward goes on to say:

> One other point I want to address is his memory loss. He feels the memory loss is a direct result of the motor vehicle accident. Apparently he was tested by Dr. Meyers but I don't have that report. However, it is clear that there are certain patients who after a whiplash type of injury do develop memory problems. This is presumed to basis on a very mild brain injury with mild bilateral temporal lobe dysfunction as a consequence of the injury dynamics. Certainly Mr. Meyers['] memory

17

> loss syndrome would be consistent with this
> type of injury. [He calls him Mr. Meyers
> but it is really Mr. Meylor].

Defendant's App. p. 272.

This is a flat statement that memory loss here is not surprising. The defendant's doctors ignore this statement.

As set out on page 1 of this Order, the Hartford Insurance policy involved in this case agrees to pay $4,721.58 for every month that the plaintiff could not perform the job he had before his accident for a maximum of 24 months. As set out on page 1 of this Order, this lawsuit is about plaintiff's claim for payment for 10 more months at $4,721.58, for a total of $47,215.80.

The decision not to pay the last ten months under the policy was a decision made by Hartford, an ERISA plan administrator, and has been reviewed by this Court under an abuse of discretion standard. This Court has concluded that the plan administrator's decision was not reasonable and not supported by substantial evidence.

**IT IS THEREFORE HEREBY ORDERED** that this Court is persuaded that the plaintiff herein has shown that the plan administrator's decision was an abuse of discretion, that it was not reasonable and, therefore, judgment for the plaintiff

is hereby awarded the sum of $47,215.80, plus interests and costs.

**IT IS FURTHER HEREBY ORDERED** that the plaintiff may make application for the payment attorneys fees.

**IT IS SO ORDERED** this 18th day of December, 2006.

_____
Donald E. O'Brien, Senior Judge
United States District Court
Northern District of Iowa